**SO ORDERED.**

**SIGNED this 13th day of November, 2014.**



*Dale L. Somers*
United States Bankruptcy Judge

___

For on-line use only; not for print publication

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re: | |
| | CASE NO. 13-22462 |
| **TUCKER BROTHERS, L.L.C.,** | CHAPTER 12 |
| DEBTOR. | |

### MEMORANDUM OPINION AND JUDGMENT
### DETERMINING VALUE OF BANK'S REAL PROPERTY COLLATERAL AND
### DENYING CONFIRMATION OF DEBTOR'S FOURTH AMENDED PLAN

On October 2, 2014, an evidentiary hearing was held on valuation of Debtor's real

property and confirmation of Debtor/Farmer's Fourth Amended Plan of Reorganization

(Plan),[1] to which creditor Farmers State Bank, Blue Mound, Kansas objected.[2] Debtor appeared by counsel William L. Needler of William L. Needer and Associates, Ltd., and by its manager, Thomas J. Tucker. Farmers State Bank appeared by counsel Bruce Woner and Patricia A. Reeder, of Woner, Glenn, Reeder & Girard, P.A. and Lonnie Sprague, its executive vice president. After hearing the evidence, the Court took the matter under advisement.[3] For the reasons stated below, the Court finds for purposes of the Plan that Debtor's real property should be valued at $1,740,405 and denies confirmation of Debtor's Plan.

**BACKGROUND FACTS.**

Debtor Tucker Brothers, L.L.C. filed a voluntary petition for relief under Chapter 12 on September 19, 2013. Thomas J. Tucker, aged 64, is the managing member of Debtor. The other member is Thomas's brother, who is 14 months older. Debtor engages in agricultural pursuits primarily by raising and marketing livestock and offspring on land

---

[1] Doc. 165. The Court notes that after the hearing, Debtor filed his First Modification of Debtor/Farmer's Fourth Amended Plan Pursuant to 11 USC § 1223 of the Bankruptcy Code (doc. 196). The Court will not consider these modifications. They were filed after the record was closed and the objection to the Plan taken under advisement.

[2] Doc. 169.

[3] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of Reference of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order 13-1, *printed in* D. Kan. Rules of Practice and Procedure at 168 (March 2014). Allowance of claims and confirmation of plans are core proceedings which this Court may hear and determine as provided in 28 U.S.C. § 157(b)(2)(B) and (L). There is no objection to venue or jurisdiction over the parties.

it owns in Bourbon County, Kansas. Debtor's Schedule A lists 1060 acres of farmland in Bourbon County, Kansas valued at $1,250,000. Schedule B lists cash, vehicles, animals, inventory, farming equipment, and supplies valued at $41,230. Farmers State Bank (Bank) is the only secured creditor listed of Schedule D. Bank's claim is listed at $1,570,000, with $320,000 of the claim unsecured. Schedule E, creditors holding unsecured priority claims, lists Bourbon County's tax claim of $10,667.22. One unsecured creditor, holding a claim of $152,069.99, is listed on Schedule F. No executory contracts or unexpired leases are scheduled. The equity holders of Debtor are listed as co-debtors.

On January 3, 2014, Bank filed a secured proof of claim for $1,598,855.90, comprised of principal, interest, and attorney fees and expenses. Debtor and Bank stipulated that the amount of Bank's claim as stated in its proof of claim is the amount owing by Debtor to Bank on the date of filing. The parties also agree that the Bank's claim is secured by: (1) approximately 1061 acres of real estate in Bourbon County, Kansas; and (2) all of Debtor's personal property, including equipment and livestock.

Debtor's Plan classifies claims and places Bank's secured claim in Class C. It then bifurcates the claim into two claims: (1) a "real estate claim" in the amount of $1,450,000, secured by Bank's first mortgage lien on farmland; and (2) a "personal property claim" of $50,731.47 secured by the Bank's security interest in personal property. Debtor's plan proposes that it retain all of the assets, both real and personal, that

3

it owned on the date it petitioned for relief. Debtor's Plan proposes to pay the "real estate claim" as follows:

| | |
|---|---|
| Year 1 (Oct. 30, 2015) | $20,949.00 |
| Year 2 (Oct. 30, 2016) | $20,949.00 |
| Year 3 (Oct. 30, 2017) | $20,949.00 |
| Years 4 through 17 | $86,417.46 |
| Year 18 | balloon[4] |

The payments in years one through three are characterized as adequate protection payments in the amount of "reasonable customary rent for this type of land in this Kansas location."[5] For these three years, there is no payment of principle[6] or interest on the "real estate claim" and no accrual of interest. The payments in years 4 through 17 are payments of principle and interest on a debt of $1,450,000 amortized over 30 years at 4.25 per cent. During years one through three Debtor plans to purchase a total of 100 cows from Mark Snelson for $125,000 and proposes to grant the Bank a security interest in the cows as they are purchased. Debtor's Plan includes as an expense $5,000 per year for replacement cows starting in the second year.

---

[4] The Court believes the balloon would be in the amount of $944,242.25, using Debtor's amended amortization schedule.

[5] Doc. 165, 6-7.

[6] Doc. 193, amended exh. D to Plan. *But see* Plan (doc. 165, 7) stating, "Additionally, starting the 4th year under the Plan, the secured claim of $1,450,000 on the land, less the Adequate Protection Payments previously paid under the Plan, shall be paid at the "Till Rate" of 4.25% amortized over 30 years."

4

The "personal property claim" is in the amount of $50,731.47. Payments are $4,970.52 per year, commencing on October 30, 2015, with a balloon in 10 years. The payments are calculated based upon a 15 year amortization period at 5.25 percent interest.

Bank objects to confirmation on multiple grounds. The most significant objections, which were the focus of the evidence at the confirmation hearing, are: under valuation of the Bank's "real estate claim;" failure to meet the requirements of § 1225(a)(5)(B) with respect to the payments on the "real estate claim" and the "personal property claim;" failure to meet the feasability requirement of § 1225(a)(6); and improperly seeking to retain causes of action.

**DISCUSSION.**

The treatment of secured claims in a Chapter 12 plan is addressed by § 1225(a)(5). It provides three alternatives: (1) acceptance by the secured creditor; (2) cram down; and (3) surrender of the collateral to the secured creditor. In the Plan, Tucker Brothers seeks to cram down both the "real estate claim" and the "personal property claim." A plan which crams down an allowed secured claim can be approved over the objection of the secured creditor if:

> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
>    (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less that the allowed amount of such claim;[7]

---

[7] 11 U.S.C. § 1225(a)(5).

This section "requires the bankruptcy court to determine the amount of the creditor's allowed secured claim and whether the proposed payment stream has a present value that is equal to the allowed secured claim."[8] The Chapter 12 debtor has the burden of establishing all elements necessary for confirmation.[9]

**A. The Plan does not satisfy § 1225(a)(5)(B)(ii) because the Plan uses an incorrect value for the amount of Bank's allowed secured claim.**

The first step in analyzing whether a secured claim can be crammed down is the determination of the amount of the allowed secured claim. The amount of an allowed secured claim is the amount of the allowed claim, or the value of the collateral securing the claim, whichever is less.[10]

The parties have stipulated that the amount of Bank's claim on the date of filing was $1,598,855.90 and agree that the claim is secured by Debtor's real and personal property, including equipment, machinery, hay, and livestock. Debtor's Plan is predicated on a total allowed secured claim of $1,500,731.47, divided into the $50,731.47 secured "personal property claim" and the $1,450,000 secured "real property claim," leaving an unsecured claim of $98,124.43. Bank objects, claiming that its allowed claim as of October 1, 2014 is $1,719,279.60,[11] comprised of the amount owed

---

[8] *First Nat'l Bank of Durango v. Woods (In re Woods)*, 465 B.R. 196, 204 (10th Cir. BAP 2012) rev'd on other grounds *In re Woods*, 743 F.3d 689 (10th Cir. 2014).

[9] *In re Ames*, 973 F.2d 849, 851 (10th Cir. 1992).

[10] 11 U.S.C. §§ 501 and 506.

[11] Doc. 185, 3.

6

on the petition date plus post petition interest at the contract rate, attorneys fees, and costs, and that claim is fully secured by Debtor's personal property, valued in the Plan at $50,731.47, and by Debtor's the real property, which the Bank contends has a value of $1,815,000.[12]

At trial, the parties each presented an appraisal expert who testified in support of their respective valuations of the real property. Debtor's expert, Dennis Totman, is a certified residential appraiser. He testified that in his opinion, Debtor's 883.74 acre tract of contiguous grazing land had a value of $1,211,000 as of April 18, 2014.[13] As to the land value, the appraisal used the comparable sales approach, but it adopted the county appraiser's $70,000 valuation of out buildings on this tract. Because the mineral rights are not owned by the Debtor, Mr. Totman testified that he reduced by $300 per acre the value determined through the comparable sales method using similar tracts which included mineral rights. When the value of the outbuildings is deducted from the appraised value, the result is a value of $1,291.10 per acre. Mr. Totman separately appraised two smaller tracts, comprised of 178.1 total acres, at $239,000, or $1,341.94 per acre. His total appraised value for Debtor's real property was $1,450,000.

Bank's appraisal, prepared by Joshua Adamson of Martens Appraisal, was more detailed. Mr. Adamson appraised the land value of 865.35 acres (the entire large tract without the 20 acres on which the outbuildings are located) to be $1,340,000 using the

---

[12] Exh. 1-A, § 1-3 and Exh. 1-B, § 1-3.

[13] Doc. 167, 4.

7

direct capitalization approach and to be $1,320,000 using the sales comparison approach. These values were reconciled to be $1,330,000 or $1,536.95 per acre.[14] The sales comparison method expressly adjusted values of comparables based upon whether land was used for pasture or crops. No adjustment was made for Debtor's lack of ownership of mineral rights. The appraisal separately valued the 20 acres on which the outbuildings are located, using the depreciated replacement cost method for the improvements, valued at $144,595,[15] and $1,525 per acre for the 20 acres of land, rounded to $30,000, for a rounded total value of $175,000. The Martens appraisal valued the approximately 885 acre tract, including the outbuilding, at $1,505,000. Independent appraisals were conducted for the remainder of the land, comprised of an east south parcel of 152.28 acres and a noncontiguous east north parcel of 25.98 acres.[16] The income approach and the sales comparison approaches were used for both parcels, which after reconciliation resulted in values of $60,000 for the "east north tract" and $250,000 for the "east south tract." According to the Martens appraisal, the value of Debtor's real property as of April 28, 2014 is $1,815,000.

Except in one respect, the Court finds Bank's appraisal to be more credible. Mr. Adamson, who prepared the Martens appraisal, is a licensed commercial appraiser, whereas Mr. Totman retained by Debtor is a licensed residential appraiser. The Martens

---

[14] Exh. 1-A, § 1-3.

[15] Exh. 1-A, § 7-6.

[16] Exh. 1-B.

8

Case 13-22462   Doc# 202   Filed 11/13/14   Page 8 of 19

appraisal used two appraisal methods, whereas the Totman appraisal relied exclusively upon the comparable sales method. When using the comparable sales approach, the Martens appraisal used more current sales and expressly adjusted for the differing uses of the land. The Court rejects Mr. Totman's deduction of $300 per acre because the mineral rights do not run with the approximately 884 acre tract. The Court finds credible the testimony of Mr. Adamson that such a deduction is not appropriate, since there is no gas, oil, or mining activity in the area. When that adjustment is restored to the Totman appraisal, the value per acre for the approximately 885 acre tract (without considering the value of the outbuildings) is $1,591 per acre. Bank's per acre value for the same land is $1,537 per acre. However, the Court rejects Bank's appraisal of $144,595 for the improvements. Rather, the Court adopts the County appraiser's value of $70,000, which was adopted by Mr. Totman. A value significantly lower than the Martens' depreciated cost value is also supported by Tom Tucker's testimony, who testified that in his opinion the outbuildings were not worth even $70,000. For these reasons, the Court concludes that the value of the approximately 885 acre tract as of April 2014 was $1,430,405, calculated by reducing the Martens' appraised value of $1,505,000 by $74,595 (the reduction in value of the outbuildings resulting from substituting the county's $70,000 appraised value for the Martens' depreciated cost value of $144,595).

For similar reasons the Court adopts that the Martens' appraised value for the 152.28 and 25.98 acre tracts. That appraisal used both the income and market comparison methods. The Martens comparable sales were more recent than those used by Totman.

9

This factor is important in the current market where prices have risen in the last few years. Also, the details of the Martens appraisals more accurately reflect the fact that the "north east tract" was exclusively grass/pasture land, whereas the "south east tract" has 29 acres of dry crop land with the remainder native grass.

The Court therefore concludes that the value of Debtor's real property for purposes of the Plan should be $1,740,405, comprised of $1,430,405 for the approximately 883 acre tract (including the out buildings), $60,000 for the north tract, and $250,000 for the south tract.

Because the Bank did not object to Debtor's $50,731.47 valuation of the personal property collateral and there was no evidence on that value, the Court will use this value when evaluating the Plan. For purposes of the Plan, the total value of collateral securing Bank's claim is therefore $1,791,136.47.

Bank filed a proof of claim for $1,598,855.90, secured by Debtor's real and personal property. Debtor did not object, so the claim is deemed allowed.[17] Under § 506(a)(1), "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property."[18] Since the value of the collateral, $1,791,136.47 exceeds the value of the claim, Bank's entire claim as of the date of filing is an allowed secured claim.

---

[17] 11 U.S.C. § 502(a).

[18] 11 U.S.C. § 506(a)(1).

Further, Bank's allowed secured claim may be increased under § 506(b), which provides:

> To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.[19]

Bank has filed two applications for allowance of post petition interest, fees, and expenses. The first, for the period September 19, 2013 to July 31, 2014, relying on provisions of the loan documents and attached billing statements, prays for allowance of post petition interest of $53,615.39 and attorney fees and expenses of $44,767.22.[20] The Debtor filed an objection but did not contest the allegation that such addition to the allowed claim is provided for in the loan documents. The Bank's second application, for the period of August 1, 2014 through October 1, 2014, seeks interest of $10,552.87 and fees and expenses of $8,617.43.[21] The total of the additional amounts which Bank prays be added to the allowed secured claim is $117,552.91.

No hearing has been held on Bank's motions, but it is likely that all or a significant portion of the requested postpetition claim will be allowed. This would

---

[19] 11 U.S.C. § 506(b).

[20] Doc. 158.

[21] Doc. 187.

increase Bank's allowed secured claim to approximately $1,716,400,[22] as of October 1, 2014.

The Plan is predicated upon Bank's allowed secured claim being $1,300,731.47, the sum of the "personal property claim" of $50,731.47 and the "real estate claim" of $1,250,000. This is not the correct amount. Even if Bank's motions for post petition interest and expenses were denied in total, which is highly unlikely, Bank's allowed secured claim would $1,598,855.90, the stipulated amount of Bank's claim as of the date of filing. The Plan does not attempt to and does not succeed in distributing to Bank property having a value, as of the effective date of the Plan, on account of Bank's allowed secured claim, in an amount not less than the allowed amount of such claim, as required by § 1225(a)(5)(B)(ii).

**B. Even if the amount of Bank's allowed secured claim were $1,300,731.47, the sum of the "personal property claim" of $50,731.47 and the "real estate claim" of $1,250,000, Bank's claims addressed by the Plan, confirmation would be denied.**

**1. The value of the property to be distributed with respect to the "real estate claim" is less than the allowed claim, using Debtor's valuation and therefore § 1225(a)(5)(B)(ii) is not satisfied.**

The most glaring deficiency in the Plan's treatment of the "real estate claim" is the delay in payment of principal and interest until year four of the plan. During the first three years, Bank is to receive adequate protection payments, measured by the rental

---

[22] In its trial brief, Bank states the total claim is $1,719,279.60, as of October 1, 2014 (doc. 185, 3).

12

value of the collateral. These payments are not credited against either interest or principal, and there is no interest accrual.

Debtor characterizes this treatment as negative amortization - instead of reducing the debt by the payment of interest and principal during the first three years, the debt is increasing by the accrual of interest. A more detailed explanation is the following by the Ninth Circuit Court of Appeals:

> Negative amortization refers to "a provision wherein part or all of the interest on a secured claim is not paid currently but instead is deferred and allowed to accrue," with the accrued interest added to the principal and paid when income is higher. The extent of negative amortization depends upon the difference between the "accrual rate," or the overall rate of interest to be paid on a claim, and the "pay rate," or the rate of interest to be paid on a monthly basis. Even when a debtor defers payments of interest on its debt obligation, the deferred amount can be capitalized at a rate of interest which enables the deferred amount to equal the present value of the creditor's allowed secured claim.[23]

Whether negative amortization is permissible under the fair and equitable standard applicable to Chapter 11 plans is determined on a case by case basis by consideration of ten enumerated factors.[24] Some of the factors which the Ninth Circuit identified for consideration are: "Is the amount and length of the proposed deferral reasonable; Is the ratio of debt to value satisfactory throughout the plan; Are the debtor's financial projections reasonable . . . ; What is the nature of the collateral, and is the value of the

---

[23] *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1176 (9th Cir. 1992), quoting *In re Club Associates*, 107 B.R. 385, 398 (Bankr. N.D. Ga. 1989).

[24] *Id.*, 1178.

13

collateral appreciating, depreciating, or stable; . . . ; and Are there adequate safeguards to protect the secured creditor against plan failure."[25] The Ninth Circuit BAP relied on these factors when affirming a bankruptcy court's confirmation of a Chapter 12 plan that included a 21-month partial deferral on interest, where the creditor was oversecured and the loan-to-value ratio would increase only slightly, from 71% to 75%.[26] A bankruptcy court in the Ninth Circuit held that a Chapter 12 plan satisfied the requirements of § 1225(a)(5) where the secured creditors would receive partial interest payments during the first four years, the deferred interest would be accumulated, and the total accumulated sum including the principal would be amortized over the remaining 16 years.[27]

In this case, Debtor's negative amortization does not satisfy § 1225(a)(5). The annual interest on $1,250,000 at 4.25% is $53,125. Unlike the forgoing negative amortization plans which were confirmed, during the first three years of this Plan, no interest is paid. The amount of the deferral is not reasonable. The deferred interest is not capitalized. This alone is fatal to the proposal. In addition, because Debtor has no equity in the farm property, the accruing interest obligation, if capitalized would be unsecured. In effect the Plan provides for Bank to make an interest free, unsecured loan for three years.

---

[25] *Id.*

[26] *Miller v. Nauman (In re Nauman)*, 213 B.R. 355, 362-64 (9th Cir. BAP 1997).

[27] *In re Big Hook Land & Cattle Co.*, 81 B.R. 1001, 1006 (Bankr. D. Mont. 1988).

14

The Court rejects Debtor's suggestion that granting Bank a security interest in cows to be purchased during the first three Plan years and the adequate protection rent to be paid during those years cure any defect. Granting Bank a lien in the cows to be purchased under the Plan would provide an additional $37,500 in collateral each per year. But providing collateral each year valued at almost $20,000 less than the accruing annual interest still leaves a negative amortization plan where Debtor has no equity in the collateral. Likewise, if the $20,949 adequate protection payments are considered partial interest payments, the negative amortization aspect of the Plan would require denial of confirmation. There would be deferred interest of approximately $35,000 per year, without any provision that it be added to the principal and without an equity cushion.

**2. The payment periods for both the "real estate claim" and the "personal property claim" were not shown to be appropriate under the circumstances of this case.**

Debtor has not sustained his burden of proof to show that the payment periods are appropriate.[28] "When contemplating a plan's repayment period, a court may consider the length of the underlying note and the creditor's customary repayment periods for similar loans."[29] The annual Plan payments on the "real estate claim" are calculated at 4.25% interest over 30 years, with a balloon payment after 15 installments, which installments do not start until year four of the Plan. The annual Plan payments on the "personal property claim" are calculated at 4.25% interest over 15 years, with a balloon in 10 years.

---

[28] Bank does not challenge the 4.25% interest rate.

[29] *In re Woods*, 465 B.R. at 208.

15

All of Bank's notes with Debtor, including the real estate note, are for a period of one year or less. The Plan if confirmed would significantly change Bank's expectations when making the loans. Debtor has provided no evidence that the Plan payment periods are customary for similar loans.

**3. The Debtor has not shown that the Plan to be feasible.**

Before confirming a plan, § 1225(a)(6) requires the Court to find that "the debtor will be able to make all payments under the plan and to comply with the plan." "In order to satisfy the feasability test, it will be necessary for the debtor to submit sufficient evidence with regard to the debtor's projected income and expenses to enable the court to determine that the debtor can make all of the payments called for by the plan."[30] The Court is not satisfied as to the feasability of the Plan.

Although the Plan is predicated upon Debtor changing the focus of his farming operations from raising of horses to raising of cows, in which he had engaged in the past, little evidence was presented about Debtor's historical success in the projected operations or to otherwise support in the income and expense projections in the Plan, particularly in light of the volatility of the prices of live stock and feed.

More importantly, Debtor provided no testimony as to the feasability of payment of the projected balloon payments. The managing member of Debtor is 64 years old, and

---

[30] 8 *Collier on Bankruptcy* ¶ 1225.02[5] at 1225-10 (Alan N. Resnick & Henry J. Sommer eds.-in-chief, 16th ed. 2014).

the other member is 14 months older. Refinancing of the "personal property claim" in ten years could be problematical since both members will be almost 75 years old, the value of livestock is difficult to predict, and the equipment will have further depreciated. The "real property claim" balloon will mature in approximately 20 years, when the members will be in their mid eighties. Absent considerable appreciation in the value of the farm land, Debtor will have little equity. The Court has no basis on which to find a reasonable expectation that the balloon payments, required by the Plan, can be refinanced when they become due.

**4. The Plan's provision for retention of a § 510(c) equitable subordination cause of action as to Bank's claim will not be approved.**

Bank objects to Debtor's inclusion of the following as a general provision of the Plan:

> Nothing in this Plan, including any prior classification or treatment of the holders of a claim of any type, shall prevent this Debtor/Farmer from bringing any actions at any time under Section 510(c) of the Bankruptcy Code against any Creditor secured or unsecured.[31]

Under § 510(c), the court, under principles of equitable subordination based upon wrongful conduct of the claimant, may subordinate all or part of an allowed claim to all or part of another allowed claim or subordinate all or part of an allowed interest to all or part

---

[31] Doc. 165, 12.

of another interest.[32] Such subordination is limited to reordering the priority of claims to ensure fairness in the bankruptcy process as a whole.[33]

Bank's objection is that Debtor may interpret the forgoing provision of the Plan to provide a basis for Debtor to attempt to subordinate Bank's claim after confirmation of a Plan which provides for payment of that claim. The Court agrees that preservation of such an action would be inappropriate. Generally, the confirmation of a Chapter 12 plan binds Debtor and creditors to the plan provisions. "The order of confirmation acts as a *res judicata* determination of all matters dealt with by the plan."[34] Although an order of confirmation may specifically preserve certain matters open to future determination, in order for such provisions not to conflict with the binding effect of the plan, they must be limited to those matters not necessary to confirmation.[35]

In this case, the amount of Bank's secured claim and the priority of the liens securing that claim are central to the confirmation of any proposed Plan. Bank is the only secured creditor, and whether that claim can be crammed down is the primary hurdle to confirmation. In addition, Debtor has stipulated the Bank's proof of claim accurately

---

[32] 3 William L. Norton, Jr., and William L. Norton III, *Norton Bankruptcy Law & Practice 3d*, § 53:3 at 58-8 (Thomson Reuters/West 2014).

[33] *Id*.

[34] 8 *Collier on Bankruptcy* ¶ 1227.01[1] at 1227-2.

[35] *See In re Buchholz*, 224 B.R. 13, 25-26 (Bankr. D.N.J. 1998).

states the status of the claim as of the date of filing.  If Debtor wishes to attempt to subordinate Bank's claim in any respect, it must do so before, not after, confirmation.

**CONCLUSION.**

The Court finds that Debtor's real property should be valued at $1,740,405 and denies confirmation of Debtor's Plan.  Debtor shall have 35 days from the date of entry of this order to file an amended plan consistent with the above holdings.        .

The foregoing constitute Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter.

**JUDGMENT**.

Judgment is hereby entered determining the value of Debtor's real property for purposes of plan confirmation is $1,740,405 and denying confirmation of Debtor/Farmer's Fourth Amended Plan of Reorganization.  The judgment based on this ruling will become effective when it is entered on the docket for this case, as provided by Federal Rule of Bankruptcy Procedure 9021.

**IT IS SO ORDERED.**

###